# MADISON GAS AND ELECTRIC COMPANY, et al., Petitioners,

v.

## SECURITIES AND EXCHANGE COMMISSION, Respondent.

Interstate Energy Corporation, Intervenor.

No. 98–1216.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1999.

Decided March 16, 1999.

Scott Hempling, Silver Spring, MD, argued the cause for the petitioners.

Susan S. McDonald, Counsel, Securities and Exchange Commission, argued the cause for the respondent. Eric Summergrad, As-

sistant General Counsel, and Paul Gonson, Solicitor, Washington, DC, were on brief.

Russell E. Brooks and Toni C. Lichstein, New York City, were on brief for the intervenor.

Before: EDWARDS, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Petitioners Madison Gas & Electric Company and the Wisconsin Citizen's Utility Board seek review of a decision of the Securities and Exchange Commission (Commission or SEC), which approved the application, filed pursuant to section 10 of the Public Utility Holding Company Act (PUHCA or Act), 15 U.S.C. § 79j, of WPL Holdings, Inc. (WPL), IES Industries, Inc. (IES) and Interstate Power Company (IPC) to merge into a new holding company, Interstate Energy Corp. (Interstate). The petitioners assert the Commission's approval of the merger violated sections 10(b)(1), 10(c)(1) and 10(c)(2) of PUHCA, 15 U.S.C. §§ 79j(b)(1), 79j(c)(1), 79j(c)(2). Finding no violation of PUHCA, we deny the petition for review.

## I.

On July 26, 1996 WPL, IES and IPC filed an application to merge IES and IPC into WPL which was then to be renamed Interstate Energy Corp. At the time of the application WPL was the holding company of Wisconsin Power & Light Company, which was both a public utility providing electricity in southern and central Wisconsin and itself the holding company of South Beloit Water, Gas & Electric Co., a public utility serving northern Illinois. IES was the holding company of IES Utilities, which provided gas and electricity to customers in Iowa. IPC was a public utility providing gas and electricity to customers in Minnesota, Iowa and Illinois. Under the merger proposal Interstate was to

become the holding company of WP&L (which would in turn continue to hold South Beloit Water, Gas & Electric Co.), IES Utilities and IPC, thereby controlling four public utilities. On October 11, 1996 the SEC filed a notice of the application pursuant to 17 C.F.R. § 250.23, directing that comments and hearing requests be filed no later than November 5, 1996. Filing Notice, 61 Fed. Reg. 54,687 (1996).

During 1997 the merger was approved separately by the Federal Energy Regulatory Commission (FERC) (November 12, 1997), the Wisconsin Public Service Commission (November 7, 1997), the Illinois Commerce Commission (March 9, 1997), the Minnesota Public Utilities Commission (March 24, 1997) and the Iowa Utilities Board (September 26, 1997). On June 16, 1997, long after the November 1996 deadline for comment or hearing requests, the petitioners filed a notice of appearance, motion to intervene and request for hearing, opposing the merger.

On April 14, 1998 the SEC released its opinion and order approving the merger and denying the petitioners' request for hearing. *WPL Holdings, Inc.*, Holding Co. Act Release No. 26,856, 66 SEC Docket 2256, 1998 WL 172800 (Apr. 14, 1998), (SEC Op.).[1] The petitioners seek review of the SEC's decision.

## II.

As noted above, the petitioners contend the SEC's approval of Interstate's merger violated three provisions of PUHCA: section 10(c)(2), 15 U.S.C. § 79j(c)(2); section 10(b)(1), 15 U.S.C. § 79j(b)(1); and section 10(c)(1), 15 U.S.C. § 79j(c)(1). In reviewing the SEC's decision we must treat its factual findings as "conclusive" "if supported by substantial evidence," 15 U.S.C. § 79x(a), and accept its interpretation of PUHCA if it "neither contravenes Congress's intent nor is 'unreasonable,'" *City of New Orleans v. SEC*, 969 F.2d 1163, 1168 (D.C.Cir.1992) (citation omitted). We address each statutory challenge separately.

1. The SEC denied the hearing request because it had been "filed over seven months after the expiration of the notice period in this matter." SEC Op. at 47.

## A.  Section 10(c)(2)

Section 10(c)(2) of the Act provides that the SEC "shall not approve ... the acquisition of securities or utility assets of a public-utility or holding company unless the Commission finds that such acquisition will serve the public interest by tending towards the economical and efficient development of an integrated public-utility system." 15 U.S.C. § 79j(c)(2). The SEC made the required finding and the petitioners challenge it on two grounds: (1) the merged Interstate is not an "integrated public-utility system" under the Act and (2) there is no evidence that the merged system will be "economical and efficient." We conclude that the SEC's finding should be upheld in each respect.

First, the petitioners contest the finding that Interstate's merged electrical operation is an "integrated system." Section 2(a)(29)(A) of PUHCA defines an "integrated public-utility system" to mean:

> As applied to electric utility companies, a system consisting of one or more units of generating plants and/or transmission lines and/or distributing facilities, whose utility assets, whether owned by one or more electric utility companies, are physically interconnected or capable of physical interconnection and which under normal conditions may be economically operated as a single interconnected and coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair (considering the state of the art and the area or region affected) the advantages of localized management, efficient operation, and the effectiveness of regulation; . . . .

15 U.S.C. § 79b(a)(29)(A). The petitioners argue here, as they did below, that the merged electrical assets are not "physically interconnected or capable of physical interconnection" because the assets in Minnesota and Iowa (Interstate West) are physically separated from the assets in Illinois and Wisconsin (Interstate East) by the Mississippi River. The SEC found that, despite the physical separation, the statutory integration requirement was met because (1) Interstate had a three-year "firm contract" to use a transmission line owned by two unrelated parties, which line crossed the Mississippi, as an interim link between Interstates East and West and (2) Interstate planned to construct two "tie-lines" of its own to form a permanent connection.

The petitioners first contend that the Act requires that a permanent interconnection be in place at the time of the merger. We believe that the Commission has reasonably interpreted the statutory definition otherwise. Section 2(a)(29)(A)'s definition does not require that assets be actually interconnected—only that they be "*capable* of physical interconnection," that is, that it is possible to interconnect them. The SEC has reasonably construed this requirement to be satisfied in cases past "on the basis of contractual rights to use a third-party's transmission lines"[2] or "if physical interconnection is 'contemplated or ... possible within the reasonably near future.' "[3] Interstate's showing of a current transmission line contract and of a plan to build two tie-lines of its own across the Mississippi before the end of the contract term supports the Commission's finding that Interstate East and Interstate West are "capable of physical interconnection" under each of the Commission's two tests.

The petitioners also contend that actual integration of the assets is too uncertain because construction of the tie-lines must yet be approved by state regulatory agencies and because FERC conditioned approval of the construction on Interstate's addition of transfer capability to the Wisconsin Upper Michigan System, an interstate transmission facilities network. *See IES Utilities, Inc.*, 81 F.E.R.C. ¶ 61,187, at 61,828–29 (Nov. 12,

---

2.  *See UNITIL Corp.*, Holding Co. Act Release No. 25,524, 50 S.E.C. 961, 986 (April 24, 1992) (citing *Northeast Utilities*, Holding Co. Act Release No. 25,221, 50 S.E.C. 427, 451 n. 85 (Dec. 21, 1990); *Centerior Energy Corp.*, Release No. 24073, 49 S.E.C. 472 (Apr. 29, 1986); *Cities Serv. Co.*, Holding Co. Act Release No. 35–4489, 14 S.E.C. 28, 53 n. 44 (1943)).

3.  *New Century Energies*, Holding Co. Act Release No. 26,748, 65 S.E.C. Docket 277, 1997 WL 429612, at *9 (Aug. 1, 1997) (quoting *North American Co.*, Holding Co. Act Release No. 3446, 11 S.E.C. 194, 242–43 (Apr. 14, 1942)).

1997); SEC Op. at 21 (JA 40). The petitioners, however, have offered no evidence suggesting either that the state agencies, which have already approved the merger, will not approve the tie-lines as well or that Interstate will fail to comply with FERC's condition or to construct the tie-lines as planned. In any event, as the SEC noted in its decision, Interstate has committed to take measures "to ensure that the interconnection requirements of section 2(a)(29) of the Act are satisfied" if the tie-lines are not constructed and a connection agreement is not in place. *See* SEC Op. at 22 n.38.

██ The petitioners further contend that, even if Interstate's electric assets form an integrated system, there is insufficient evidence that the merger will, as the SEC found, result in efficient and economic operation of the system. The SEC based its finding in the main on Interstate's estimates that the merger would result in electrical production cost savings of approximately $220.9 million. SEC Op. at 23. The petitioners do not challenge this estimate but argue that it is not economical or efficient to spend a large sum ($4.4 million) to construct tie-lines that will add little electrical capacity to the system. The Act, however, requires that the "acquisition" as a whole, not merely the construction of an interconnection, tend toward efficiency and economy. Interstate's unchallenged figures, on which the SEC relied, support the Commission's finding that the acquisition so tends.[4]

### B. Section 10(b)(1)

██ Next, the petitioners assert that the SEC violated section 10(b)(1) of PUHCA which prohibits approval of an acquisition if the Commission finds, *inter alia,* that "such acquisition will tend towards interlocking re-lations or the concentration of control of public-utility companies, of a kind or to an extent detrimental to the public interest or the interest of investors or consumers." 15 U.S.C. § 79j(b)(1). In finding no impermissible anti-competitive tendency, the SEC relied largely on the merger's approval by FERC and by "the interested state commissions," which had "scrutinized the potential competitive effects of the Mergers." SEC Op. at 50. The petitioners object to the SEC's reliance on analyses of other regulatory bodies, contending the SEC neglected its statutory duty to conduct an independent assessment of the merger's anticompetitive effects. We disagree.

We have previously observed that the SEC is entitled to "watchfully" defer to the determinations of other regulatory bodies: "[W]hen the SEC and another regulatory agency both have jurisdiction over a particular transaction, the SEC may 'watchfully defer[ ]' to the proceedings held before—and the result reached by—that other agency." *City of Holyoke Gas & Elec. Dep't v. SEC,* 972 F.2d 358, 363–64 (D.C.Cir.1992) (quoting *Wisconsin's Envtl. Decade v. SEC,* 882 F.2d 523, 527 (D.C.Cir.1989)). In *City of Holyoke,* the SEC had found that post-merger concentration of control "raise[d] the potential for anticompetitive behavior" but "decided to defer to the FERC . . . in the delicate matter of crafting conditions designed to preclude Northeast from engaging in post-merger anticompetitive behavior." *Id.* at 363. Accordingly, the Commission conditioned its approval on that of FERC and the court upheld the SEC's decision to give FERC the final say. As in *City of Holyoke,* the SEC here deferred to other agencies' determinations that, subject to conditions imposed by FERC,[5] there was no anti-competitive effect.

---

4. In their reply brief, the petitioners acknowledged that the $220.8 million savings "can be cited to satisfy Section 10(c)(2)." Reply Br. at 6–7. At the same time, however, they argue that the inefficiency of the tie-lines construction runs afoul of the section 2(a)(29)(A) definition of an "integrated public-utility system." 15 U.S.C. § 79b(a)(29)(A). To the extent that this argument is not waived, *see Board of Regents of University of Washington v. EPA,* 86 F.3d 1214, 1221 (D.C.Cir.1996) ("[W]e have generally held that issues not raised until the reply brief are waived and we do so here.") (internal citations omitted), it must be rejected because, similarly to section 10(c)(2), section 2(a)(29)(A) requires that a system's combined "assets" (and not the interconnection in particular) be economically operated.

5. FERC's approval was subject to "certain specifically tailored conditions for the Mergers that addressed the alleged anticompetitive effects of the Mergers" and "are specifically intended to 'mitigate the anti-competitive effects of this

Unlike *City of Holyoke,* however, the Commission did so here after rather than before the other agencies issued their decisions and therefore had the benefit of the agencies' determinations and supporting materials before it. The Commission's deference here was at least as "watchful" as in *City of Holyoke* and should therefore be upheld. *Cf. Wisconsin's Environmental Decade v. SEC,* 882 F.2d 523, 526–527 (upholding SEC's "watchful" deference to state regulatory body in determining utility's diversification did not require hearing and was not detrimental to public interest and noting court was "not prepared to say that the Commission abdicates its duty in an exemption determination by deciding to rely, watchfully, on the course of state regulation").

## C. Section 10(c)(1)

Section 10(c)(1) expressly subjects holding company acquisition approvals to the provisions of section 11 of the Act: "[T]he Commission shall not approve ... an acquisition of securities or utility assets, or of any other interest, which is unlawful under the provisions of section 79h of this title [PUHCA § 8] *or is detrimental to the carrying out of the provisions of section 79k [PUHCA § 11].*" 15 U.S.C. § 79j(c)(1) (emphasis added). Relevant here, section 11(b)(1) imposes on the SEC

> the duty ... as soon as practicable after January 1, 1938:
>
> (1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system.

15 U.S.C. § 79k(b)(1). The statute provides a single exception to the integration requirement: "That the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems" if the SEC makes specific findings set out in the "ABC clauses," 15 U.S.C. § 79k(b)(1)(A)-(C). The Commission made the required findings and therefore concluded that Interstate comes within the ABC exception. The petitioners challenge the Commission's determination on two grounds. We find neither one persuasive.

■ First, the petitioners argue, as they did below, that section 10 acquisition approvals are subject to section 11(b)(1)'s integration requirement but not to its ABC exception. According to the petitioners, the exception is available only to holding companies existing as of January 1, 1938, PUHCA's original effective date, because the exception requires the SEC to "permit a registered holding company to *continue to control* one or more additional integrated public-utility systems," 15 U.S.C. § 79k(c)(1) (emphasis added), and only existing holding companies could *continue* to control additional systems. The petitioners' contention rests on a misunderstanding of the relationship between section 10 and section 11 of the Act.

In enacting section 11, titled "Simplification of holding company systems," the Congress imposed on the Commission the duty to "examine" existing public utility holding companies "to determine the extent to which unnecessary complexities may be removed, voting power fairly and equitably distributed among security holders, and the properties in a holding company system confined to those necessary or appropriate to the operations of a single geographically and economically integrated public utility system." S.Rep. No. 621, 74th Cong., 1st Sess. 32 (1935). Complementarily, section 10, as enforced through section 9 of the Act,[6] was "designed to give

---

merger, reduce Applicants' market power to safe harbor levels consistent with U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ... and permit the [FERC] to find that the merger is consistent with the public interest.' " SEC Op. at 50–51 (quoting *IES Utilities, Inc.,* 80 F.E.R.C. ¶ 63,001, at 65,-002 (administrative law judge decision)).

**6.** Section 9(a) provides:

> Unless the acquisition has been approved by the Commission under section 79j of this title, it shall be unlawful—
>
> (1) for any registered holding company or any subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, to acquire, directly or indirectly, any securities or

the Commission supervision over the future development of utility holding systems so that the systems will be subjected to the limitation of geographic and economic integration laid down in section 11." *Id.* at 30, *quoted in* SEC Op. at 33–34. To this end section 10(c)(1), as noted above, expressly incorporates section 11's requirements. By its terms, however, section 10(c)(1) does not require that new acquisitions comply to the letter with section 11. In contrast to its strict incorporation of section 8 (proscribing approval of an acquisition "that is unlawful" thereunder), with respect to section 11 section 10(c)(1) prohibits approval of an acquisition only if it "is detrimental to the carrying out of [its] provisions." The Commission has consistently read this provision to import into section 10's regime not only the integration requirement of 11(b)(1)'s main clause but also the exception to the requirement in the ABC clauses, 15 U.S.C. § 79k(b)(1)(A)-(C).[7] Given the complementary nature of the two sections and the legislative history suggesting an intent to subject existing holding companies and new acquisitions to the same limitations, it is not unreasonable to conclude, as the Commission has, that section 11's implementation will not be harmed if its ABC integration exception is available to newly formed holding companies as well as to existing ones. Under this interpretation, the phrase "continue to control" in section 11(b)(1), on which the petitioners place so much emphasis, may be viewed simply as reflecting its context (examining existing holding companies) and not as a conscious restriction of the ABC exception's reach.

■ Having concluded that the ABC exception is properly applied to section 10 holding companies that did not exist as of PUHCA's effective date, we sustain the SEC's determination that Interstate fits within the exception. The petitioners assert the Commission should have required Interstate to divest itself of its gas systems—which deprive Interstate of "single integrated public system" status under section 11(b)(1)—because there was insufficient evidence to support the finding, required under clause (A) of section 11(1), that "each of such cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system." 15 U.S.C. § 79k(b)(1)(A).[8] We conclude that the Commission's finding that divestiture will result in substantial "lost economies" is supported by substantial evidence and must therefore be sustained.

In making its finding the SEC applied the formula it had recently used to calculate lost economies in *New Century Energies*, Holding Co. Act Release No. 26,748, 65 S.E.C. Docket 277, 1997 WL 429612, at *10 (Aug. 1,

---

utility assets or any other interest in any business;

(2) for any person, by use of the mails or any means or instrumentality of interstate commerce, to acquire, directly or indirectly, any security of any public-utility company, if such person is an affiliate under clause (A) of paragraph (11) of subsection (a) of section 79b of this title, of such company and of any other public utility or holding company, or will by virtue of such acquisition become such an affiliate.

15 U.S.C. § 79i(a).

7. *See, e.g., New Century Energies*, Holding Co. Act Release No. 26,748, 65 S.E.C. Docket 277, 1997 WL 429612 (Aug. 1, 1997); *UNITIL Corp.*, Holding Co. Act Release No. 25,524, 50 S.E.C. 961, 986 (April 24, 1992); *see also Philadelphia Co. v. SEC*, 177 F.2d 720 (D.C.Cir.1949) (applying ABC clauses but upholding SEC finding that applicant did not satisfy them).

8. The ABC clauses provide in full:

Provided, however, That the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems, if, after notice and opportunity for hearing, it finds that—

(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system;

(B) All of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and

(C) The continued combination of such systems under the control of such holding company is not so large (considering the state of the art and the area or region affected) as to impair the advantages of localized management, efficient operation, or the effectiveness of regulation.

15 U.S.C. § 79k(b)(1)(A)-(C). The petitioners do not challenge the Commission's findings under clause (B) or clause (C) of the exception.

1997). The Commission compared the ratio of each gas system's estimated increased costs to its historical amounts of income and revenue, as calculated in the applicants' study, and found, as it had in *New Century Energies,* that clause A was satisfied because the ratios were "generally consistent with ratios found adequate to support retention in earlier cases." SEC Op. at 27. The Commission further noted, although it considered the ratios by themselves sufficient support,[9] that "other factors operate to compound the loss of economies represented by increased costs." *Id.* Specifically, the Commission found that the combined retention of gas assets "offers Applicants a means to compete more effectively in the emerging energy services business" and that "[e]ach of the state commissions found that gas customers would benefit from the Mergers." *Id.* These factors in conjunction with the cost comparisons from Interstate's study adequately support the Commission's finding of lost economies.

 Apart from the substance of the clause A finding, the petitioners object to the Commission's exclusive reliance on studies prepared by Interstate. Citing *City of New Orleans v. SEC,* 969 F.2d 1163, 1166 (D.C.Cir.1992), they contend the Commission was under a duty to verify the studies' data independently. In *City of New Orleans,* however, the court faulted the Commission for accepting raw data from an applicant because the Commission did not have before it any "underlying support for the estimates." 969 F.2d at 1167. Here, by contrast, it appears that the Commission had not only the comparison calculations but also the

assumptions and methodology that yielded them. *See* SEC Op. at 27.

For the preceding reasons, we uphold the SEC's approval of the Interstate merger. Accordingly, the petition for review is

*Denied.*

---

9. In early cases the Commission took the view "that increased operational expenses are not sufficient to show satisfaction of clause A." *New Century Energies,* 1997 WL 429612, at 11 (citing *New England Electric Sys.,* Holding Co. Act Release No. 15,035, 41 S.E.C. 888 (Mar. 19, 1964); *Standard Power & Light Corp.,* Holding Co. Act Release No. 8242 (Jun. 1, 1948); *Engineers Pub. Serv. Co.,* Holding Co. Act Release No. 3796, 12 S.E.C. 41, 62 (Sept. 16, 1942)). The Commission explained in *New Century Energies* that it no longer required other factors such as "the assumption that a combination of gas and electric operations is typically disadvantageous to the gas operations, and the assumption, conversely, that the public interest and the interests of investors

and consumers (the protected interests under the Act) are promoted by a separation of gas and electric operations." *Id.* at 11. Because of increasing competition among gas providers, the Commission reasoned, these assumptions are no longer so compelling, while "[i]ncreased expenses of separate operation may no longer be offset, as they were in *New England Electric System,* by a gain of qualitative competitive benefits, but rather may be compounded by a loss of such benefits, as the Commission finds in this matter." *Id.* Although the petitioners attack this change, they have failed to seriously draw in question the Commission's reappraisal of its earlier assumptions. We therefore see no objection to the change of viewpoint.