276 F.3d 609 (D.C. Cir. 2002)
 National Rural Electric Cooperative Association and American Public Power Association, Petitioners
v.
Securities and Exchange Commission, Respondent
American Electric Power Company, Inc. and Paul S. Davis, Intervenors
 No. 00-1371
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued October 4, 2001
Decided January 18, 2002
 
 Petition for Review of an Order of the Securities and Exchange Commission
 Scott Hempling argued the cause for petitioners. With him on the briefs was David S. Lapp. Richard B. Geltman entered an appearance.
 John W. Avery, Special Counsel, Securities & Exchange Commission, argued the cause for respondent. With him on the brief was Eric Summergrad, Deputy Solicitor.
 J. A. Bouknight Jr. argued the cause for intervenor. With him on the brief were Samuel T. Perkins, Cynthia L. Taub and Niki Kuckes. Douglas G. Green entered an appearance.
 Before: Edwards, Henderson and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Tatel.
 Tatel, Circuit Judge:
 
 
 1
 The Securities and Exchange Commission authorized American Electric Power Company, which provides electricity services in a number of eastern and midwestern states, to acquire a company that provides electricity services in several distant southern and southwestern states. Challenging the Commission's decision, two electric utility associations argue that the post-acquisition company will violate section 10 of the Public Utility Holding Company Act, 15 U.S.C. 79j, which requires that any registered public-utility holding company comprise a "single integrated ... system" that is "physically interconnected or capable of physical interconnection" and "confined in its operations to a single area or region," id. 79j(c)(1); 79k(b)(1); 79b(a)(29)(A). Because the Commission failed to explain its conclusions regarding the interconnection requirement, and because it failed to justify its finding that the proposed acquisition will satisfy the single-area-or-region requirement, we vacate the Commission's order and remand for further proceedings consistent with this opinion.
 
 I.
 
 2
 Congress passed the Public Utility Holding Company Act of 1935, 15 U.S.C. 79a et seq. ("PUHCA"), to "protect consumers and investors from abuses associated with [interstate] public utility holding companies," Envtl. Action, Inc. v. SEC, 895 F.2d 1255, 1258 (9th Cir. 1990). Many of these companies had developed highly pyramidal structures with a few not always responsible shareholders of the top holding company exercising excessive control over the underlying operating companies. See Am. Power & Light Co. v. SEC, 329 U.S. 90, 100-03 (1946). To ensure that "the growth and extension of holding companies" bear some "relation to economy of management and operation or ... integration and coordination of related operating properties," 15 U.S.C. 79a(b)(4), the Act requires most interstate holding companies to register with the Securities and Exchange Commission, id. 79e, and charges the Commission with reviewing all transactions in which a registered holding company proposes to acquire securities or utility assets of another holding or public-utility company, id. 79j.
 
 
 3
 Although PUHCA states that the Commission "shall approve" most proposed acquisitions, id. 79j(b), it details several conditions barring approval, two of which are relevant here. First, the Act prohibits approval of an acquisition if the Commission finds that the resulting holding company will no longer constitute a single "integrated public-utility system," id. 79j(c)(1); 79k(b)(1), defined elsewhere as --
 
 
 4
 [A] system ... whose utility assets, whether owned by one or more electric utility companies, are physically interconnected or capable of physical interconnection and which under normal conditions may be economically operated as a single interconnected and coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair (considering the state of the art and the area or region affected) the advantages of localized management, efficient operation, and the effectiveness of regulation.
 
 
 5
 Id. 79b(a)(29)(A). The Commission has broken this language down into four separate prerequisites for approval of a proposed acquisition: (1) The post-acquisition public-utility system's assets must be "physically interconnected or capable of physical interconnection" (the interconnection requirement); (2) the assets must be capable of economic operation "as a single interconnected and coordinated system" (the coordination requirement); (3) the system itself must be confined to a "single area or region" (the region requirement); and (4) the system "must not be so large as to impair ... the advantages of localized management, efficient operation, and the effectiveness of regulation" (the localization requirement). Electric Energy, Inc., PUHCA Release No. 13871, 38 S.E.C. 658, 668 (Nov. 28, 1958). The second relevant PUHCA condition prohibits the Commission from approving an acquisition unless the Agency finds that the proposed transaction will "serve the public interest by tending towards the economical and efficient development of an integrated public-utility system." 15 U.S.C. 79j(c)(2). To win Commission approval, then, a proposed acquisition must not only meet the four single-integrated-system requirements, but do so in a way that produces net " 'efficiencies and economies.' " Wisconsin's Envtl. Decade, Inc. v. SEC, 882 F.2d 523, 528 (D.C. Cir. 1989) (quoting Union Elec. Co., PUHCA Release No. 18368, 45 S.E.C. 489, 494 (Apr. 10, 1974)).
 
 
 6
 The proposed acquisition at issue here will merge Central and South West Corporation's ("CSW") four wholly-owned operating subsidiaries, which currently supply power to parts of Arkansas, Louisiana, Oklahoma, and Texas, with Intervenor American Electric Power Company's ("AEP") wholly-owned electric generating company and seven wholly-owned electric operating utilities, which supply power to parts of Indiana, Kentucky, Michigan, Ohio, Tennessee, Virginia, and West Virginia. Under the terms of the agreement, a newly-formed AEP subsidiary will merge with and into CSW. CSW will survive the merger, but it and most of its subsidiaries will become subsidiaries of the post-acquisition company--so-called "New AEP." With more than thirty-seven thousand megawatts of generating capacity, New AEP will serve close to five million customers in eleven states.
 
 
 7
 AEP and CSW's systems are neither contiguous nor physically interconnected--indeed, at their closest point, they are separated by hundreds of miles. See Appendix A; see also AEP, Service Territories, at http://www.csw.com/about/ territory.htm (last visited Nov. 8, 2001). The companies propose to interconnect their systems by means of a 250megawatt, unidirectional transmission service contract with Ameren Corporation. This "contract path" will enable New AEP's western zone (the current CSW system) to make use of some surplus generating capacity--that is, generating capacity over and above firm load obligations--in the eastern zone (the current AEP system). The contract extends for four years (from June 1, 1999 to May 31, 2003), after which New AEP may renew, though potentially at greater cost. See Resp't's Br. at 35. AEP and CSW apparently expect that there will be fewer "opportunit[ies] to transfer energy economically" from west to east than from east to west, but when and if such opportunities arise, New AEP proposes to make use of its rights under pre-existing transmission service agreements. Am. Elec. Power Co., Inc. & Central S. W. Corp., PUHCA Release Nos. 35-27186, 70-9381, 2000 SEC LEXIS 1227, at *61 n.79, *65-66 (June 14, 2000) ["Approval Order"].
 
 
 8
 The proposed acquisition requires the approval of several regulatory agencies in addition to the Securities and Exchange Commission. The Federal Energy Regulatory Commission granted conditional approval in March 2000 provided that AEP and CSW reduce the merger's potential anticompetitive effects by divesting 550 megawatts of generating capacity and "limit[ing] their ability to contract for firm transmission capacity from [east to west] to 250" megawatts. Am. Elec. Power Co., Cent. & S. W. Corp., Docket Nos. EC98-40-000, ER98-2770-000, ER98-2786-000, 90 F.E.R.C. p 61,242, 61776 (2000) (reversing in part, affirming in part, vacating in part, and modifying FERC's initial decision); see also Wabash Valley Power Ass'n v. FERC, 268 F.3d 1105 (D.C. Cir. 2001) (denying petition for review). The public utility commissions of the affected states also considered the proposed merger, and most explicitly approved side agreements among AEP, CSW, and third parties, all drafted to ensure that ratepayers realize benefits from the transaction. Approval Order, 2000 SEC LEXIS 1227, at *23-24 & n.28.
 
 
 9
 On June 14, 2000, the Securities and Exchange Commission added its voice to the chorus approving the proposed acquisition. Id. at *113. Dismissing concerns expressed by four intervenors--a coalition of utility stakeholders and a group of consumer counselors, as well as Petitioners in this case, the American Public Power Association and the National Rural Electric Cooperative Association--the Commission found that the merger satisfies PUHCA's requirements. Id. at *44-109. Specifically, the Commission concluded that the contract path, though both temporary and unidirectional, "is adequate to ... satisfy the interconnection requirement" because it will permit "the economic transfer of energy from one zone of the New AEP System ... to another," generating "net-fuel related savings of approximately $98 million over the ten-year period following the merger." Id. at *50-51. Moreover, the Commission observed, AEP has "committed" either "to renew the [c]ontract [p]ath" or to find another way to satisfy the interconnection requirement after 2003. Id. at *48.
 
 
 10
 With respect to the statute's coordination requirement, the Commission conceded that New AEP's structure will "differ in some respects from the traditional ... utility model," in which generating capacity is centrally pooled and dispatched--presumably because New AEP's east and west zones will continue to satisfy their respective power demands separately, transferring power from east to west only when "one [z]one has surplus capacity available for sale and the other has insufficient capacity." Id. at *54-55, 61. The Commission was unconcerned by this lack of centralization, however, because it viewed "unbundling of generation and transmission" to be "the direct result of [government] efforts to promote a competitive energy market--a goal consistent with" PUHCA's purpose of ensuring that the growth of holding companies fosters economy of management and operation. Id. at *75.
 
 
 11
 The Commission next addressed PUHCA's region requirement. Finding that recent technological advances have "reduced the relative importance of ... geographical limitations" on utility systems, the Commission declined to read this third requirement as imposing any independent conditions on the proposed merger. Id. at *83. Rather, the Commission found that the merger satisfies PUHCA's other requirements-including interconnection and coordination (discussed above) and localization (discussed below)--and then concluded, "[i]n view of these considerations, ... the New AEP System will operate in a 'single area or region.' " Id. at *85.
 
 
 12
 Turning to the fourth single-integrated-system requirement, localization, the Commission observed that "[v]arious state regulators have ... demonstrated that they can effectively regulate the New AEP System," in that they have already imposed "an extensive list of service quality standards on the New AEP System Operating Companies that operate within their states." Id. at *94. Additionally, the Commission indicated that most affected states have imposed conditions on the proposed merger, under which the states retain the ability to review the activities of New AEP and its affiliates and subsidiaries. Id. at *94-95. Noting that it has historically "found that effectiveness of state regulation is not impaired where state regulators have the same jurisdiction before and after a merger," id. at *95 (citing Conectiv, Inc., PUHCA Release Nos. 35-26832, 70-9069, 60 S.E.C. Docket 1260 (CCH) (Feb. 25, 1998)), and also citing its conclusion (discussed below) that the AEP-CSW merger will generate efficiencies, id. at *99, the Commission concluded that New AEP will not be "so large as to impair ... the advantages of localized management, efficient operation, and the effectiveness of regulation," PUHCA, 15 U.S.C. 79b(a)(29)(A).
 
 
 13
 Finally, the Commission considered PUHCA's requirement that any "acquisition of securities or utility assets of a public utility or holding company" must itself tend "towards the economical and efficient development of an integrated publicutility system." Id. 79j(c)(2). Referring to AEP and CSW's projection that the merger will save "almost $2 billion of net non-fuel cost[s]" and "approximately $98 million" of fuel-related costs over the first ten years, the Commission indicated that it had "reviewed the assumptions and methodologies" underlying the projection and found them "reasonable and consistent with ... precedent." Accordingly, the Commission determined that the merger will produce sufficient "economies and efficiencies" to pass muster under PUHCA. Approval Order, 2000 SEC LEXIS 1227, at *10004.
 
 II.
 
 14
 Reiterating many of the substantive arguments they raised during the Commission's review process, Petitioners claim that the Commission erred in finding that the proposed acquisition satisfies PUHCA's interconnection and region requirements and in accepting AEP and CSW's projections regarding the cost savings that will result from the merger. Petitioners also argue that the Commission's "decision not to hold evidentiary hearings as part of its review of the application for approval of the acquisition was arbitrary and capricious because the acquisition raised factual issues substantially in dispute." Pet'rs' Br. at 2. In considering these claims, we follow the familiar rules of administrative review, accepting the Commission's findings of fact as long as they are supported by "substantial evidence," Steadman v. SEC, 450 U.S. 91, 97 n.12 (1981) ("Commission findings of fact are conclusive for a reviewing court if supported by substantial evidence." (internal citations omitted)), and affirming its conclusions of law unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. 706(2)(A). See, e.g., Wonsover v. SEC, 205 F.3d 408, 412 (D.C. Cir. 2000) (applying this standard).
 
 Interconnection Requirement
 
 15
 Petitioners have two principal concerns regarding the Commission's application of the statute's interconnection requirement: first, that the companies' "temporary, one-way transmission contract" is "too small and too tentative" to satisfy PUHCA, and second, that the Approval Order departed from Commission precedent without adequate explanation. Pet'rs' Br. at 23-24, 33-35. In support of their first point, Petitioners contend that AEP and CSW's contract with Ameren permits the transfer of only a "[t]oken [a]mount" of power, in that the 250-megawatt contract path "represents just 0.68 percent" of New AEP's combined 37,000 megawatts of generating capacity. Id. at 24-25. Moreover, they argue that the unidirectional contract path cannot satisfy PUHCA because the Act requires interconnection--a term that, to Petitioners, implies two-way transfers of power. Petitioners also point out that AEP and CSW have never said how they plan to satisfy the interconnection requirement after 2003. The companies' promise to devise an alternative method of interconnecting their systems if they opt not to renew the contract path is, according to Petitioners, inadequate because " 'separate properties not interconnected must be capable of physical interconnection ... at the time the Commission considers the matter and not at some indefinite future time.' " Id. at 27 (quoting Gen. Pub. Utils. Corp., PUHCA Release No. 10982, 32 S.E.C. 807, 825 (Dec. 28, 1951)). Finally, Petitioners invoke our decision in Madison Gas & Elec. v. SEC, 183 F.3d 1337, 1340 (D.C. Cir. 1999), for the proposition that a transmission contract cannot, in and of itself, support a finding that utility assets are "physically interconnected or capable of physical interconnection," PUHCA, 15 U.S.C. 79b(a)(29)(A).
 
 
 16
 We are unpersuaded by Petitioners' characterization of the contract path as too "small" and "tentative." Although we recognize that 250 megawatts represents a small percentage of New AEP's total generating capacity, Petitioners point to no statutory language, legislative history, or case law requiring that physically separated zones of a power system be interconnected by lines capable of transmitting any specific percentage of the power generated in each zone. Moreover, the Commission said it could order New AEP to divest one of the systems if the company fails to devise a satisfactory method of integrating its utilities after the contract with Ameren expires. Resp't's Br. at 35-36.
 
 
 17
 Nor are we swayed by Petitioners' reference to Madison Gas. All we said there was that a power system's "showing of a current transmission line contract and of a plan to build two tie-lines ... before the end of the contract term" adequately supported the Commission's finding that the system's two zones were "capable of physical interconnection." Madison Gas, 168 F.3d at 1340 (internal citations omitted). This in no way implies that the transmission line contract would be insufficient, in and of itself, to satisfy PUHCA. On the contrary, just before approving the Commission's interconnection finding we observed that "[t]he SEC has reasonably construed [the interconnection] requirement to be satisfied in cases past on the basis of contractual rights to use a third-party's transmission lines or if physical interconnection is contemplated or ... possible within the reasonably near future." Id. (internal citations omitted) (emphasis added). Thus, nothing in Madison Gas precludes a finding that AEP and CSW's contract with Ameren meets PUHCA's interconnection requirement.
 
 
 18
 We are, however, puzzled by the Commission's acceptance of a unidirectional contract path to "interconnect" AEP and CSW. Webster's Dictionary defines "interconnection" as "connection between two or more: mutual connection"--a definition that seems, on its face, to require two-way transfers of power. Webster's Third New International Dictionary 1177 (1993) (emphasis added). In addition, PUHCA itself requires that the interconnected system be one "which under normal conditions may be economically operated as a single interconnected and coordinated" whole. 15 U.S.C. 79b(a)(29)(A). Absent some explanation from the Commission, we cannot understand how a system restricted to unidirectional flow of power from one half to the other can be operated in such a manner.
 
 
 19
 Moreover, we agree with Petitioners that the Commission failed to follow its own prior reasoning regarding interconnection of distant utilities. Petitioners point to several prior orders in which the Commission expressly indicated that "contract rights cannot be relied upon to integrate two distant utilities." WPL Holdings, Inc., PUHCA Release No. 3526856, 53 S.E.C. 501, 517 n.39 (Apr. 14, 1998) (emphasis added) (concluding that "the distances at issue in this matter"--between cities in Iowa and Wisconsin--are "within the parameters of the previous decisions"), aff'd, Madison Gas & Elec., 183 F.3d 1337; see also UNITIL Corp., PUHCA Release No. 35-25524, 50 S.E.C. 961, 967 n.30 (Apr. 24, 1992) ("[C]ontract rights cannot be relied upon to integrate two distant utilities."); Northeast Utils., PUHCA Release Nos. 35-25221, 70-7695, 50 S.E.C. 427, 449 n.75 (Dec. 21, 1990) (indicating that "the use of a third party cannot be relied upon to integrate two distant utilities"). Although these statements were dicta, Petitioners argue that they express a clear policy from which the Commission departed in approving the AEP-CSW merger. We agree.
 
 
 20
 As Petitioners point out, the Commission has clearly indicated that a contract path cannot alone integrate distant utilities. We think those statements sufficiently explicit to obligate the Commission to provide some rationale for its current contrary view. "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." Greater Boston Tel. Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970). This is particularly true here, since the few cases in which the Commission has accepted transmission contracts as evidence of interconnection, unlike this case, have involved contracts for transmission of large amounts of power in both directions between relatively closely situated utility assets. E.g., Conectiv, Inc., 66 S.E.C. Docket at 1266 (stating that "the physical interconnection requirement of the Act can be satisfied on the basis of contractual rights to use third parties' transmission lines, when the merging companies are members of a tight power pool"--that is, a group of utilities that coordinate their planning and operation to improve economy and reliability); UNITIL Corp., 50 S.E.C. at 966 (deciding that contract rights were adequate to interconnect utilities, both because the utilities were part of a tight power pool, and because they were located in New England, a small area with "unique geographical characteristics"); Centerior Energy Corp., PUHCA Release Nos. 35-24073, 70-7149, 49 S.E.C. 472, 478 (Apr. 29, 1986) (approving use of third-party transmission lines to interconnect two formerly separate utility systems in light of a study showing that the transmission lines would be adequate even in an emergency in which one of the systems had to meet 100% of the other system's power demand).
 
 
 21
 Recognizing the apparent conflict between its past and present views on the interconnection issue, the Commission rationalized its approval of the contract path in this case as follows:
 
 
 22
 There is dicta in a series of our decisions stating that contract rights cannot be relied on to "integrate" "distant" utility properties.... We do not believe that these statements mean that a contract path might not meet the interconnection requirement because of its length. These earlier cases suggest that the reason a contract path might not "integrate" two distant utilities was due to the "single area or region" requirement.... We did not hold in any of these prior cases that the length of a contract path was relevant in determining whether the interconnection requirement ... was met. Such an approach would be inappropriate in view of the express language of [PUHCA] as well as technological and commercial developments that have made feasible the transmission of power over longer distances. Approval Order, 2000 SEC LEXIS 1227, at *49-50. We perceive only one rational interpretation of this peculiar paragraph: Although a long transmission line may be sufficient to interconnect two distant utilities, the length of the line--that is, the distance between the connected utilities-may violate PUHCA's region requirement. Yet the Commission concedes that it failed explicitly to consider the length of the contract path in deciding whether New AEP meets the region requirement. Resp't's Br. at 37 n.24. The Commission cannot first distinguish its prior orders on the grounds that a factor considered in those orders is relevant to one part of its analysis but not another, and then ignore that factor altogether. There may be a satisfactory explanation for the Commission's change in course, but it is not evident from the Approval Order now before us.
 
 Region Requirement
 
 23
 Challenging the Commission's determination that the proposed merger satisfies PUHCA's region requirement, Petitioners make three arguments: No industry standard supports the conclusion that AEP and CSW are in the same "region"; the Commission failed to make independent evidentiary findings to support that conclusion; and finally, the Commission erred in deciding that a proposed acquisition that meets the other single-integrated-system requirements is necessarily also confined to a single region. We agree with the Commission that the first argument "read[s] into [PUHCA] additional constraints that are not imposed by" the statute's language. Resp't's Br. at 30. Nothing in the Act requires, as Petitioners imply, that a utility system's boundaries conform to those of the "reliability regions" created by the voluntary North American Reliability Council ("NARC"). Nor does the Act mention FERC's "regional transmission organizations." While the Commission could potentially point to boundaries identified by NARC or FERC as evidence that a utility system is confined to a single region, Petitioners may not point to such boundaries as evidence that a utility system is not so confined. The Commission may make its own decision regarding the meaning of the region requirement; NARC and FERC actions have no precedential value for that decision.
 
 
 24
 That said, we agree with Petitioners that the Commission's decision that New AEP meets the region requirement cannot withstand even the most deferential review, both because the Commission failed to make any evidentiary findings on the issue and because it erroneously concluded that a proposed acquisition that satisfies PUHCA's other requirements also meets the statute's region requirement. On the first point, we note that prior Commission decisions addressing the region requirement have analyzed such factors as the geography and socioeconomic characteristics of the areas covered by the system. In Middle West Corp., for example, the Commission stated:
 
 
 25
 To find that an aggregation of the properties of Southwestern Light, Public Service and Southwestern Gas constitutes a single system, we must find that an area 400 miles north-to-south and 350 miles east-to-west embraces but a single area or region. In well-settled and economically developed territory such a finding might be impossible. But the geographical characteristics of the territory encompassed by this sector of properties are fairly homogeneous. The area is more or less typical throughout, relying largely on oil and other minerals, agriculture, and relatively light industry for its subsistence. The rendition of satisfactory service in arid and sparsely-settled areas frequently requires the stretching of lines over long distances to connect small population centers with generating facilities strategically placed near suitable water and fuel supplies. In view of these facts we believe that the properties in question lie within a single area or region.
 
 
 26
 PUHCA Release No. 4846, 15 S.E.C. 309, 336 (Jan. 25, 1944). Similarly, in American Natural Gas Co., the Commission listed several factors that could be relevant to a finding that different service areas are located in "a common economic and geographic region," including "industrial, marketing and general business activity, transportation facilities, and gas utility requirements." PUHCA Release No. 15620, 43 S.E.C. 203, 206 (Dec. 12, 1966).
 
 
 27
 The Approval Order in this case considers none of these factors. Never mentioning whether the territories served by AEP and CSW have common geographic or geologic traits, the order's discussion of the region requirement rests on two repeated assertions: that the terms "area" and "region" are "by their nature ... susceptible of flexible interpretation," e.g., Approval Order, 2000 SEC LEXIS 1227, at *81, 84, and that "recent institutional, legal and technological changes have reduced the relative importance of geographical limitations" on utility systems, id. at *83, 87, 92. From these statements, which we accept as true, the Commission somehow concludes that it may reach an affirmative decision regarding the region requirement without any substantive discussion of the noncontiguous and seemingly dissimilar regions served by New AEP.
 
 
 28
 In fact, as Petitioners' final argument stresses, the Commission's Approval Order ultimately determines that New AEP satisfies the region requirement not because of any identified similarities between the areas currently served by AEP and those served by CSW, but instead because New AEP satisfies all other PUHCA requirements:
 
 
 29
 As described above, the New AEP System will be interconnected and susceptible of economic and coordinated operation.... We find below that the size of the New AEP System will not impair efficient operation, localized management or effective regulation and that the Merger will result in economies and efficiencies.... In view of these considerations, we find that the New AEP System will operate in a single area or region.
 
 
 30
 Id. at *85 (internal quotations omitted). This analysis conflicts with PUHCA's express requirement that an electric utility system be "confined in its operations to a single area or region ... not so large as to impair ... the advantages of localized management, efficient operation, and the effectiveness of regulation." 15 U.S.C. 79b(a)(29)(A). The Commission applies the requirement as if it did not include the word "single" but instead read: "confined to an area or areas not so large as to impair...." Technological improvements may well justify ever-expanding electric utilities, but PUHCA confines such utilities to a "single" area or region.
 
 
 31
 In support of its approval of the merger in this case, the Commission cites its decision in North American Co., PUHCA Release No. 35-5657, 18 S.E.C. 459 (Mar. 13, 1945), for the principle that a "flexible approach" to interpreting the region requirement "is not new," Resp't's Br. at 26-27. But that case involved an integrated gas rather than electric system--a highly relevant detail, for even in 1945, PUHCA specifically provided that "gas utility companies deriving natural gas from a common source of supply may be deemed to be included in a single area or region." 15 U.S.C. 79b(a)(29)(B) (1940). Thus, the statute itself expressly supported the Commission's conclusion that the two natural gas companies in question lay "in a single area within the meaning of the Act" despite the "wide intervening territory lying between them." North American Co., 18 S.E.C. at 46263. No comparable statutory language supports the Commission's parallel decision regarding the electric utilities at issue in this case. See 15 U.S.C. 79b(a)(29)(A).
 
 
 32
 The Commission may well be right that PUHCA's region requirement is outdated in light of recent technological advances. In view of the statute's plain language, however, only Congress can make that decision. In fact, a pending bill would repeal PUHCA, but it has not yet become law. See Public Utility Holding Company Act of 2001, S. 206, 107th Cong. 4 (2001) (last action in May 2001). In the meantime, the Commission may not interpret the phrase "single area or region" so flexibly as to read it out of the Act. The Commission may have some legitimate basis for concluding that AEP's service territories in Indiana, Kentucky, Michigan, Ohio, Tennessee, Virginia, and West Virginia fall in the same "region" as CSW's service territories in Arkansas, Louisiana, Oklahoma, and Texas, but we cannot find it in the record before us.
 
 Economies and Efficiencies
 
 33
 This brings us finally to Petitioners' arguments regarding PUHCA's requirement that a holding company's acquisition of securities or utility assets of another holding or publicutility company produce net "economies and efficiencies." According to Petitioners, the Commission erred in accepting AEP and CSW's projections that the proposed merger will produce approximately $2.1 billion in cost savings. We disagree. We owe considerable deference to the Commission's assertion that it "reviewed the assumptions and methodologies that underlie" the projections and found them "reasonable and consistent with ... precedent." Approval Order, 2000 SEC LEXIS 1227, at *102. Moreover, Petitioners point to no evidence or expert testimony supporting their assertion that the companies' calculations were flawed. Their unsupported claims that the projections are speculative and that the companies' FERC-mandated divestiture of generating capacity is neither economical nor efficient are insufficient to cast doubt on the Commission's contrary findings or even to raise a substantial question of fact warranting a hearing. Cf. City of Holyoke Gas & Elec. Dep't v. SEC, 972 F.2d 358, 365 (D.C. Cir. 1992) (noting that the Commission need only grant a hearing if "the ultimate decision will ... be enhanced or assisted by the receipt of [additional] evidence," and that we review for abuse of discretion a Commission decision not to hold a hearing).
 
 III.
 
 34
 The Commission's order is vacated and this matter is remanded for further proceedings consistent with this opinion.
 
 
 35
 So ordered.
 
 
 36
 [Tabular or Graphical Material Omitted]
 
 
 37
 Appendix A: Map of the United States showing the CSW service territories in parts of Arkansas, Louisiana, Oklahoma, and Texas, and the AEP service territories in parts of Indiana, Kentucky, Michigan, Ohio, Tennessee, Virginia, and West Virginia.