Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 12, 2004        Decided April 6, 2004

No. 03–1196

WHX CORPORATION,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of the
Securities and Exchange Commission

*Charles R. Mills* argued the cause for petitioner. With him on the briefs was *Dylan B. Carp*. *Paul Gonson* entered an appearance.

*Giovanni P. Prezioso*, General Counsel, Securities and Exchange Commission, argued the cause for respondent.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

With him on the brief were *Eric Summergrad*, Deputy Solicitor, and *Hope H. Augustini*, Senior Litigation Counsel.

Before: EDWARDS and HENDERSON, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: The Securities and Exchange Commission found that WHX Corporation violated the All Holders Rule, SEC Rule 14d–10(a)(1), 17 C.F.R. § 240.14d–10(a)(1), and issued a cease-and-desist order prohibiting the company from committing or causing any future violations of that Rule. WHX petitioned for review. We find that the SEC's decision to issue a cease-and-desist order was arbitrary and capricious, and therefore vacate the order.

* * *

In March 1997 WHX decided to attempt a hostile takeover of Dynamics Corporation of America ("DCA"). But DCA's charter had a poison pill that allowed shareholders to purchase new shares at rock-bottom prices if any party acquired 20 percent of DCA's stock without the approval of DCA's board. Further, New York law (New York Business Corporation Law § 912(b)) forbids a New York corporation from entering into a "business combination" with any shareholder owning 20 percent of the corporation's stock until the shareholder has held the stock for at least five years, unless the shareholder first secures board approval. See Opinion of the Commission, *In re WHX Corporation*, Admin. Proc. File No. 3–9634, SEC Exchange Act Release No. 47980 (June 4, 2003) ("Opinion") 2–3.

To overcome the opposition of the incumbent board, WHX planned a two-stage takeover strategy. First, it would make a cash tender offer for 19.9 percent of DCA's common stock, offering $40 a share. Second, it would conduct a proxy contest seeking to oust the DCA board and replace it with a new one that would revoke the pill and approve a merger with WHX. Under the terms of this merger, WHX would

purchase all remaining DCA shares for $40 cash. Opinion at 3.

The timing of WHX's planned tender offer posed an additional problem. The next annual DCA shareholder meeting was scheduled for May 2, 1997. But the record date for that meeting was March 14, 1997, which had already passed by the time WHX was ready to launch its offer. Because only holders of record (or holders of proxies from record holders) could vote at the shareholder meeting, an ordinary tender offer for common stock would yield WHX at least some (and possibly many) shares that couldn't vote at the May 2 meeting. As WHX's purpose was to maximize its voting power without running afoul of DCA's poison pill, it wanted to avoid buying shares that would be effectively useless. Opinion at 3.

WHX's solution triggered the SEC sanction at issue here. It proposed to include in its offer a condition under which the offer would extend only to those shareholders who were holders as of the March 14 record date, or who were able to obtain a valid proxy. WHX's attorney recognized that this condition might be thought to violate the so-called All Holders Rule, see Opinion at 4, which was promulgated under § 14(d) of the 1934 Securities Exchange Act, 15 U.S.C. 78n(d), and which provides:

> (a) No bidder shall make a tender offer unless:
>
> (1) The tender offer is open to all security holders of the class of securities subject to the tender offer.

17 C.F.R. § 240.14d–10(a)(1). The SEC adopted this rule in 1986 in response to concerns about "discriminatory tender offers" that would pressure "security holders who are excluded from the offer . . . to sell to those in the included class" in order to receive the premium price, but who "would not receive the information required by the Williams Act, would have their shares taken up on a first-come first-served basis and would have no withdrawal rights." Amendments to Tender Offer Rules: All–Holders and Best–Price, Exchange

4

Act Release No. 34–23421, 51 Fed. Reg. 25873, 36 SEC Docket 131, 132 (July 17, 1986). Moreover, the SEC explained that, without this rule, the "equal treatment" provisions of the Exchange Act would easily be circumvented: an offeror could simply address an offer to "a privileged group of security holders who hold the desired number of shares" rather than purchasing the desired number of shares from all tenderers on a pro rata basis for the same consideration. *Id.* at 133. In adopting the All Holders Rule, the SEC appears to have been reacting in part to the decision in *Unocal Corp. v. Pickens*, 608 F. Supp. 1081 (C.D. Cal. 1985), which upheld as lawful a defensive self-tender that offered a high premium but excluded the shareholder attempting the takeover. See Proposed Amendments to Tender Offer Rules, Exchange Act Release No. 34–22198, 50 Fed. Reg. 27976, 27977 n.5 (July 9, 1985).

Seeking guidance, WHX faxed the SEC's Office of Mergers and Acquisitions a letter on March 24, asking for either a no-action letter or an exemption from the rule. The letter suggested several reasons why WHX thought the All Holders Rule should not apply to its proposed condition. First, it contrasted the condition with the highly discriminatory offers which precipitated the rule, such as that involved in *Unocal*, where shares tendered by or on behalf of the would-be acquirer were deliberately excluded from what in essence would be a dividend to the eligible shareholders. Under WHX's offer, by contrast, even a shareholder who had bought after the record date had some possibility of securing a proxy, and in any event would receive "the same per share price . . . in the cash merger following successful completion of the tender offer." Letter from Ilan Reich to Dixon Requesting an Exemption or No–Action Ruling (March 24, 1997) at 3.

Second, WHX argued that here the only "discrimination" reflected a virtually universal disenfranchisement of shareholders inherent in the practicalities of limiting voting to holders as of the record date. If it is legitimate to have a record date at all—which by its nature deprives late purchasers of the right to vote at the annual meeting—then why,

WHX asked, should the All Holders Rule embrace all holders on the last day of the tender offer?  *Id.*

A staffer with the SEC's Office of Mergers and Acquisitions called WHX's lawyer back the same day to inform him that the Commission did not issue no-action letters on All Holders Rule issues and that WHX should withdraw its no-action letter request.  WHX did so that afternoon.  Opinion at 4.  Although the staffer said only that the SEC didn't give no action letters on that subject, not that it refused to give such a letter on these facts, and although WHX's lawyer found the staffer not at all clear, he interpreted the statement as an indication that the Office of Mergers and Acquisition staff informally believed that the proposed condition would violate the All Holders Rule.  Opinion at 4; Transcript of Ilan K. Reich, *In re WHX Corporation*, File No. HO–3204 (Dec. 5, 1997) ("Transcript") 81, 85–86, 88–89.  Nonetheless, in light of counsel's belief that there were strong arguments why the condition did not violate the All Holders Rule, and the lack of contrary Commission precedents, WHX decided to proceed.  It announced its hostile tender offer, including the record holder condition, on March 31, 1997.  The tender offer letter noted that the SEC staff had "informally advised" WHX that the record holder condition might offend the All Holders Rule, but explained that WHX believed "special circumstances" justified the condition.  Opinion at 4.

On April 4, 1997 staff of the Office of Mergers and Acquisitions contacted WHX to say that the staff believed that the condition violated the All Holders Rule and was prepared to recommend enforcement action to enjoin the tender offer unless WHX withdrew the condition.  In response, WHX's counsel wrote to the SEC Commissioners "to explain the rationale for [the record holder provision] and to respectfully suggest that no remedial relief is necessary based on the unusual circumstances at hand."  Letter to Hon. Arthur Levitt from Ilan Reich Regarding Tender Offer by SB Acquisition Corporation (April 4, 1997) at 2.  The letter went on to argue that the All Holders Rule was adopted to prevent tender offers that discriminated against particular identifiable shareholders, and that WHX's condition did no such thing.

WHX reiterated its commitment to buy all outstanding shares at the tender offer price if its takeover bid should succeed. *Id.* at 4.

After receiving its copy of WHX's letter, the SEC staff phoned WHX on April 7 to say that it would that day ask the Commission for authority to seek injunctive relief against the offer. WHX responded with an April 7 letter to the Commission, arguing that its record holder condition was "in fact no different from a standard condition in virtually *every single* contested tender offer: namely, that valid tenders will only be accepted from holders of rights issued under a target's poison pill plan." Letter to Hon. Arthur Levitt from Ilan Reich Regarding Tender Offer by SB Acquisition Corporation (April 7, 1997) at 2.

WHX's pleas were unavailing. On April 8, the Commission authorized an enforcement action to enjoin the tender offer. WHX immediately withdrew the record holder condition. This withdrawal eliminated any occasion for injunctive action, and WHX proceeded with its takeover bid, which ultimately failed because of a competing bid by a "white knight." Opinion at 5 & n.5.

On June 25, 1998, over a year later, the SEC started cease-and-desist proceedings against WHX under Section 21C of the Exchange Act, 15 U.S.C. 78u–3. An Administrative Law Judge found no violation of the All Holders Rule. *In re WHX Corporation*, Initial Decision Release No. 173, Administrative Proceeding File No. 3–9634 (Oct. 6, 2000) ("ALJ Decision") at 24. Although finding that as a practical matter it would be very difficult for those who purchased shares between March 14 and March 31 to obtain voting rights, and that therefore it was "questionable" whether the offer was really open to these shareholders, the ALJ reasoned that the kinds of offers that had given rise to the rule had pressured ineligible shareholders to sell to eligible ones, and that no such pressure could arise here. *Id.* at n.19.

The ALJ also stressed WHX's good faith arguments for the innocence of its condition under the All Holders Rule, its reliance on counsel's prediction that its interpretation would

be upheld, and its immediate removal of the condition after the SEC authorized an enforcement action. Moreover, the ALJ observed that "[n]o harm was done by the few days the offer was arguably out of compliance," and that a sanction would be "counterproductive" because "[t]o impose a sanction after WHX changed its offer to conform to the Commission's instructions is a disincentive for similarly situated parties to comply with the Commission's views in the future." ALJ Decision at 24.

The SEC reversed the ALJ and imposed an order requiring WHX to "cease and desist from committing or causing any violations or future violations of Section 14(d)(4) of the Securities Exchange Act of 1934 or Rule 14d–10(a)(1) thereunder." Order Imposing Remedial Sanction, *In re WHX Corporation*, Admin. Proc. File No. 3–9634, SEC Exchange Act Release No. 47980 (June 4, 2003). The Commission first found that the record holder condition violated the All Holders Rule, rejecting WHX's arguments to the contrary. Opinion at 6–15. It found that a violation of the All Holders Rule required neither scienter or negligence, Opinion at 15–18, nor a finding of harm, Opinion at 18–19. Insofar as its opinion addressed WHX's arguments distinguishing its condition from the cases giving rise to the All Holders Rule, the SEC offered only a conclusory statement that the condition "unfairly disadvantaged shareholders who bought DCA stock between March 14 and March 31 because . . . [they] would not have been able to obtain proxies and could not participate in the tender offer." *Id.* at 11.

Before us WHX argues that (1) the SEC lacked statutory authority to promulgate the All Holders Rule in the first place; (2) even if the All Holders Rule is lawful under the statute, the SEC's interpretation of that rule as covering these facts was arbitrary and capricious; (3) even if the SEC could lawfully find that WHX's record holder condition violated the All Holders Rule, the Commission failed to provide fair notice of its interpretation to WHX, and therefore cannot impose a sanction without offending the Due Process Clause, see *General Electric Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995); and (4) even if each of the first three defenses failed,

the imposition of a cease-and-desist order was arbitrary and capricious given the circumstances of WHX's violation. Because we agree with WHX's last claim, we need not reach its other arguments.

We accord great deference to the SEC's decisions as to choice of sanction, inquiring only whether a sanction "was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *KPMG, LLP v. SEC*, 289 F.3d 109, 121 (D.C. Cir. 2002). But review does include verifying whether the Commission complied with its own standard for issuing a cease-and-desist order. *Id*. at 124. It is on that requirement that the Commission's action founders.

The Commission noted that there "must be a showing of 'some risk' of future violation," though not necessarily a very great risk. Opinion at 19. It believed the risk of future violation by WHX to be "much greater" than needed, and it went on to say that in exercising its discretion it applied a "range of traditional factors," including

> the seriousness of the violation, the isolated or recurrent nature of the violation, the respondent's state of mind, the sincerity of the respondent's assurances against future violations, the respondent's recognition of the wrongful nature of his or her conduct, and the respondent's opportunity to commit future violations. In addition, we consider whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought in the same proceedings.

Opinion at 20, citing *In re KPMG Peat Marwick, LLP*, 74 S.E.C. Dkt. 357, 2001 WL 47245 at *26 (Jan. 19, 2001). No one criterion, it said, was dispositive. *Id*.

The Commission's discussion, however, failed to explain how any reasonable application of these factors could support the imposition of a cease-and-desist order. First, the Commission stressed that there was a sufficient risk of a future violation because "WHX has made a career of establishing

and promoting public companies and will be presented with opportunities to violate the law in the future." Opinion at 19–20. Under this view, apparently, the "risk of future violation" element is satisfied if (1) a party has committed a violation of a rule, and (2) that party has not exited the market or in some other way disabled itself from recommission of the offense. Given that the first condition is satisfied in every case where the Commission seeks a cease-and-desist order on the basis of past conduct, and the second condition is satisfied in almost every such case, this can hardly be a significant factor in determining when a cease-and-desist order is warranted. The Commission itself has disclaimed any notion that a cease-and-desist order is "automatic" on the basis of such an almost inevitably inferred risk of future violation. See *KPMG*, 289 F.3d at 124–25.

The Commission urges that the "seriousness of the violation" factor weighs heavily in favor of imposing a cease-and-desist order here. The Commission's assertion that WHX's violation was "serious" is premised on two claims: first, that the All Holders Rule is clear and unambiguous, so that WHX's violation indicates willful and deliberate disregard of the rule; and second, that WHX ignored SEC staff warnings that its conduct violated the rule, and so proceeded at its peril. Neither claim passes even a weak rationality standard.

We see no basis for the Commission's idea that the plain language of the All Holders Rule clearly and unambiguously applies to WHX's record holder condition. Nothing on the face of the regulation indicates its applicability to such a condition, and WHX made a number of reasonable, good faith arguments to the SEC as to why the rule was in fact inapplicable. The Commission thought otherwise, and its interpretation of an ambiguous regulation is generally entitled to substantial deference. See *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). But if the Commission had endorsed WHX's interpretation of the All Holders Rule, we could not have rejected that alternative interpretation as "plainly inconsistent" with the rule—an observation which suggests that WHX's position did not contravene the rule's unambiguous meaning. Cf. *Satellite Broadcasting Co. v.*

*FCC*, 824 F.2d 1, 3–4 (D.C. Cir. 1987). Although WHX received informal indications that its provision violated the staff's understanding of the rule (on which more below), there was no formal Commission precedent or official interpretive guideline on point. In sum, the Commission had no basis for treating WHX's violation as "serious" because of the alleged clarity of the All Holders Rule.

The Commission's second argument for the seriousness of the violation rests on the view that WHX "acted at its peril in following counsel's recommendation to refuse to remove the Record Holder Condition in the face of the staff's warning" that the condition violated the All Holders Rule. Opinion at 21. Presumably, the Commission was referring to the staff warnings on April 4 and April 7 that it would recommend enforcement action if WHX did not remove the record holder condition, since in the March 24 exchange the staff had merely said that the Commission "did not issue" no-action letters on All Holders Rule matters, a statement that on its face did not address the merits.

It is difficult to understand why WHX's persistence after the staff said it would recommend an enforcement action should establish that WHX's violation was "serious" or "willful." True, at that point WHX had a clear idea where the Office of Mergers and Acquisitions stood on the matter. But under SEC rules parties at risk of enforcement actions are entitled to make "Wells submissions" to the Commissioners, presenting arguments why the Commissioners should reject the staff's recommendation for enforcement, see 17 C.F.R. § 202.5(c), an entitlement obviously based on recognition that staff advice is not authoritative. See *In re: Initial Public Offering Securities Litigation*, 2004 WL 60290 at *1 (S.D.N.Y 2004); see also *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (informal staff opinions lack force of law); *Bd. of Trade of Chicago v. SEC*, 883 F.2d 525, 529–30 (7th Cir. 1989) (statements by SEC staff that they will recommend enforcement are not authoritative agency actions). That procedure appears to be precisely what WHX followed in this case. In fact, the SEC staffer who informed WHX's counsel that the staff would recommend enforcement not only acknowledged the propriety of WHX's making a Wells submission under 17

C.F.R. § 202.5(c), but actually told counsel "to go to the Commission if he wanted to put something in the nature of a Wells Submission, that he should feel free to do so." See Transcript at 131–32. Finding a violation "serious" and "willful" simply because of a failure to comply immediately with the staff's interpretation effectively punishes parties who make Wells submissions that are ultimately unsuccessful. To do so is arbitrary and capricious, at least in the absence of a more compelling explanation than the SEC offered in its Opinion. We further note that SEC counsel at oral argument acknowledged that there was no other way for WHX to secure a Commission view in time for a real-world decision.

Thus the SEC's stated bases for the cease-and-desist order fall apart. The "risk of future violation" cannot be the sole basis for its imposition of the order, as the SEC's standard for finding such a risk is so weak that it would be met in (almost) every case; and the finding that the violation was serious depends on the mistakenly assumed clarity of the rule and on WHX's good faith use of procedures made available by the Commission expressly for parties in WHX's position.

There is no indication that the other factors the SEC says it evaluates when considering a cease-and-deist order would assist it in this case. Other than a brief and underdeveloped argument, Opinion at 18 n.45, the Commission fails to establish any serious harm to shareholders or the marketplace caused by the record holder condition. At no point does it consider the possibility that allowing conditions such as WHX's might actually have benefited all DCA shareholders, including those excluded by WHX's condition, by increasing the chances that a lucrative merger would succeed, or might benefit shareholders generally by increasing the capacity of the market for corporate control to discipline management. See generally *Edgar v. MITE Corp.*, 457 U.S. 624, 633–34 (1982). Moreover, though the Commission may be right in its view that harm is not an element of a violation of the All Holders Rule (a position we assume but do not decide), so that the ALJ's (unreversed) finding of no harm may not undermine the finding of a violation, it is clearly a factor the Commission claims to consider when deciding whether to

impose a cease-and-desist order. Opinion at 19 n.48. Yet the section of its order on the appropriateness of the sanction omits any discussion of harm to shareholders—beyond bland assertions that the All Holders Rule is important.

WHX committed (at most) a single, isolated violation of the rule, it immediately withdrew the offending condition once the Commission had made its official position clear, and the Commission has offered no reason to doubt WHX's assurances that it will not violate the rule in the future. In light of these factors, none of which the Commission seems to have considered seriously, the imposition of the cease-and-desist order seems all the more gratuitous.

* * *

The Commission erred in imposing a cease-and-desist order without a rational explanation of why such a sanction was appropriate under the Commission's own standards. We vacate the Order Imposing Remedial Sanctions and the portion of the Opinion finding the cease-and-desist order justified.

*So ordered.*